Filed 11/13/14  P. v. Phelps CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> RICKY LAROY PHELPS et al., <br><br>     Defendants and Appellants. | D064192 <br><br><br><br> (Super. Ct. No. SCD241481) |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Affirmed.

Mazur & Mazur and Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant Phelps.

Cannon & Harris and Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant Ndandu.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Ryan H. Peeck, Deputy Attorneys General for Plaintiff and Respondent.

INTRODUCTION

A jury found Tresor Ndandu and Ricky Laroy Phelps guilty of forcible rape (Pen. Code, § 261, subd. (a)(2)),[1] rape by a foreign object with the use of force (§ 289, subd. (a)), and forcible oral copulation (§ 288a, subd. (c)(2)(A)) of a young woman (B.F.), they found intoxicated on a street in the Gaslamp Quarter (Gaslamp) of San Diego.  Under the guise of helping B.F. to get home, they took her to Ndandu's nearby apartment building parking garage where he raped her while Phelps acted as a lookout.  The jury also found Phelps guilty of sexual battery.  (§ 243, subd. (e)(1).)  The court sentenced Ndandu to an aggregate term of 10 years.  The court sentenced Phelps to three years and 365 days in county jail for sexual battery, to be served concurrently.

Ndandu and Phelps contend on appeal the trial court erred by (1) failing to sua sponte instruct the jury regarding attempted forcible rape as a lesser included offense to forcible rape and (2) admitting evidence of a prior uncharged sexual offense by Ndandu in another state, which they contend violated their due process rights.  Finding no merit in these contentions, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

A

On June 16, 2012, B.F., who was 22 years old, along with her sister and friends, took a party bus from Chula Vista to the Gaslamp area in downtown San Diego to

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

celebrate B.F.'s sister's 21st birthday. B.F. had two or three vodka shots while getting ready for the evening and four to five vodka shots on the bus.

After arriving downtown about 10:50 p.m., the group went to a club where B.F. had a shot of tequila. The group planned to meet back at the bus at 1:30 a.m. They went to another club where B.F. had four mixed drinks and two or three more shots of vodka. B.F. had never had so much to drink and rated her intoxication level as an eight or nine on a scale of one to ten. Her sister rated it a nine.

At approximately 1:40 a.m., when B.F., her sister and some friends returned to the area where they were to meet, the bus had already left. B.F. got into an argument with her sister about missing the bus because it was B.F.'s responsibility to get the group back to the bus in time. B.F. became upset and decided to walk away to calm down. She walked two or three blocks and eventually sat down on the ledge of a building because her feet were hurting and she felt dizzy. When her phone fell to the ground, she ended up laying on the ground in the doorway of the building and dozed off.

B.F.'s sister and a friend followed B.F. when she initially walked away and sat down a short distance away, but left B.F. alone when she asked them to. When they returned to talk to B.F., she was gone. They walked for about 20 minutes looking for B.F. When B.F.'s sister's boyfriend arrived, they drove around looking for B.F. until 6:00 a.m. Eventually, the boyfriend filed a missing person report.

## B

A woman saw B.F. wedged into a doorway between two buildings. B.F. did not appear to be homeless so the woman awakened B.F. and asked if she was okay. B.F.

3

appeared intoxicated and began sobbing and slurring her words. B.F. explained to the woman she argued with her sister and she walked away because she did not want to ruin her sister's birthday. The woman told B.F. to get up because it was dangerous. B.F. said she was going to try to find her friends. Before the woman left at 2:25 a.m., she put her number in B.F.'s phone by using B.F.'s phone to call her own phone. She asked B.F. to call her when she got home safely or if she needed help.

C

B.F. fell asleep again and was next awakened by two Black males, Ndandu and Phelps. Ndandu said, "Hey, are you okay? Hey, momma, are you okay?" "Come on. Come on. You're our sister. We got to help you out. Come on. It's okay." B.F. said she wanted to go home and Ndandu reassured her he would help her by saying, "Okay. I'll get you home. I'll get you home."

Phelps hailed a cab. B.F. could not stand up in time to get into the first cab because she was dizzy, so it left. When another cab came, she decided to get in the cab because she wanted to go home. In the cab, Ndandu offered her alcohol. She declined, but he tried to pour some in her mouth and some dripped on her shirt. She felt nauseous and dizzy in the cab. She denied kissing or flirting with either man at any time.

When the cab stopped at 10th and B Street, B.F. objected saying she wanted to go home. Ndandu told her he had his car in the building and he would take her home. Ndandu used something to enter the lobby of the building. She felt nauseous and was not walking straight.

4

The surveillance video from the building showed Ndandu and Phelps with B.F. enter the lobby and walk toward the elevator bank. Ndandu was holding a bottle of alcohol. Once in the elevator, Phelps gyrated his hips and Ndandu did the same. B.F. is seen with her head against the elevator wall. They all went into the parking garage where Ndandu pointed toward his car. Ndandu left B.F. with Phelps to go get his keys.

B.F. walked to the car she thought was Ndandu's and leaned face down on the trunk area. Phelps came up behind her, held her around the waist and started rubbing her sides and buttocks. When he stuck his hand underneath her pants and underwear to rub her buttocks, she turned and said, "What are you doing?" Phelps smirked and forced a kiss on her.

B.F. tried to walk back to the door and upon seeing Ndandu said, "I just want to go home. Just leave me. It's fine. I'm going to go home." "You don't have to give me a ride. I'll find my own way."

Ndandu said, "Okay, okay, okay. It's okay." He led her toward a door she thought they had come through to enter the parking garage. The surveillance video showed Ndandu had taken B.F. by the hand to a dumpster room a few minutes after 3:00 a.m.

When they got inside, B.F. saw a dumpster and trashcans. As she turned around, Ndandu walked up to her so her back was against the dumpster. He yanked down her pants and underwear. When she bent down to pull them up, he lifted one of her legs up and she fell with her back on the ground.

5

Ndandu got on top of her and put his fingers in her vagina. B.F. pleaded with him to stop, saying, "You don't want a fat, ugly person. Please just stop. I'm a virgin. I'm on my period."[2]

When she grabbed Ndandu's hand to push it away, he moved up, put his penis in her face, and stuck it in her mouth twice. The first time, she moved her head away. The second time, she gagged. Then he moved back down and put his penis into her vagina and raped her. She tried to push herself away from him by pushing her leg against a wall. His penis came out of her vagina twice, but he reinserted it and continued to rape her. She told him to stop over 10 times. He responded, "It's okay. I like you like that. "

She suddenly heard a big crack and glass rained all over her cutting her thighs, buttocks and breast area. She continued to plead with Ndandu to stop. When he finally stopped and stood up he saw blood on his knees and inner thigh. He said, "I [f–ked] my shit up."

B.F. sat up against a trashcan and started screaming at him saying, "Leave. Just go, just go. Leave me. Leave me alone." After looking at his knees, Ndandu pulled up his pants and a woman opened the door. B.F. was still yelling at him saying, "Just go. Leave me alone." According to B.F., when she saw the woman she said, "Help. Get help." But before B.F. had finished asking for help the woman closed the door. Ndandu told B.F. to be quiet.

---

[2]      B.F. testified she was finishing her period and was wearing a small sanitary panty liner. Such a sanitary napkin was collected as evidence at the scene of the crime. There was no blood on it.

Surveillance video showed a woman entered the dumpster room to discard trash at 3:19 a.m. The woman was in the room only about 10 seconds. Ndandu appeared to be standing at the door clothed.

The woman, who lived in the building, went in to throw away a pizza box before going to work. As she opened the door to the dumpster area, she saw B.F. sitting on the floor crying with one leg out, blood on her heel and a pool of blood next to her. Ndandu was leaning against a bin facing B.F. The woman asked if she needed help. She heard B.F. say, "Leave me alone" or "Just leave." B.F. was looking in the direction of Ndandu, but the woman assumed B.F. was talking to her. The woman threw her box away, closed the door and left. The woman heard no screaming or cries for help, she only heard sobbing. As she drove to work, however, the woman continued to think the situation was not right. She called her boyfriend and asked him to call the police to report what she had seen.

During the assault, B.F. saw Phelps enter the room two or three times. The surveillance video showed Phelps walked back and forth several times between the dumpster room and the elevator room where he pushed the elevator call buttons while Ndandu and B.F. were in the dumpster room. Phelps eventually went to the lobby where he turned his jacket inside out and sat for several minutes before leaving the lobby.

Ndandu exited the dumpster room first. B.F. staggered out of the dumpster room a few minutes later at approximately 3:28 a.m. and leaned against the wall for several minutes. She felt humiliated and disgusted and started to cry. She remembered seeing

7

Ndandu's identification so she went back into the dumpster room and picked it up, thinking she would need it to report the incident.

D

B.F. found her way out of the building about 3:42 a.m. She saw someone on her way out of the building, but did not tell that person what happened because she was afraid, disgusted and humiliated.

When she got outside the building and felt she was far enough away, she leaned over and started crying hysterically. A female off-duty security guard and another security guard stopped to ask if she was okay. B.F. cried and said she wanted to go home. She said, "I just feel like I want to die." "I'm sorry. I'm not this type of person." The female security guard knew something was wrong and called 911.

Initially, B.F. was reluctant and uncooperative with the police because she felt humiliated and disgusted. Eventually, she told the police what happened and handed an officer Ndandu's identification. She was taken for a sexual assault examination.

B.F. sustained cuts on her leg, thigh, buttocks and foot. She had blood on her arm and chest, pain in her back, and significant bleeding from her vaginal area. Examinations by forensic nurses revealed B.F. had an injury on her inner lower lip and injuries to the soft palette in the back of her mouth consistent with her report the assailant forced his penis into her mouth. She also had bruising on her chest and arm. She had dried blood on her chest and foot, scratches, and red marks on her back and upper thigh. She had swelling in her genital area, including swelling of her urethra and periurethral area, a

8

laceration to her hymen, and abrasion and shearing in the fossa navicularis.[3]  B.F. had difficulty tolerating a modified speculum examination.

Semen was present in both the external genital and the vaginal swabs.  Although there was not a lot of DNA present in the vaginal swab, Ndandu's DNA was included as a major contributor.  There was a stronger result in the external genital swab showing the predominant DNA profile matched Ndandu.  The forensic examiner performed a statistical calculation on the DNA profile obtained from the external genital swab.  The approximate probability an individual chosen at random would have the same DNA profile as that found matching Ndandu in this sample was one in 14 septillion Caucasians, one in 200 sextillion to one against African-Americans, and one in 3.6 septillion Hispanics.

A few months later, the San Diego forensic examiner received notification Ndandu's DNA profile obtained in B.F.'s case also matched DNA taken from a vaginal swab of a Michigan victim (S.D.) previously entered in the Combined DNA Index System (CODIS) database.

E

S.D. testified when she was 17 years old she was living with her sister in Port Huron, Michigan.  She awoke at 3:00 a.m. on May 28, 2009, when her sister brought home two men she met at a bar.  One of the men was Ndandu, who introduced himself as

---

3    The fossa navicularis vestibule vaginae is "the portion of the vestibule of the vagina between the frenulum of the labia minora and the posteria labial commisure of the vagina."  (Stedman's Medical Dict. (28th ed. 2006) p. 767, col. 1.)

9

"Prince." He followed S.D. as she walked back to her bedroom while her sister kissed the other man on the couch in the living room.

Ndandu sat down in S.D.'s room and told her about where he was from and how men in his country like small Caucasian women, such as her. While they were talking, he began touching her hair. She got up and walked into the kitchen area toward the bathroom, but since Ndandu followed her, she got a drink in the kitchen. He then followed her back to her room. On the way back, S.D. told her sister Ndandu was getting too comfortable.

Ndandu shut her bedroom shutter doors and turned up the music playing in her room. He lay down next to her on the bed and continued playing with her hair. S.D. yelled out to her sister again saying he was getting too comfortable. Ndandu told her to be quiet saying, "She's doing her own thing in there." As he continued to play with her hair, he touched her vaginal area over her shorts. When he did this, she rolled over to face the wall and told him, "I don't know you." "Stop touching me." "Leave. Get out of my room."

Instead of leaving, Ndandu raped S.D. While she was lying on her stomach, he laid on her back and pulled down her basketball shorts. He pushed his penis into her vagina from behind while he pushed her head into the pillow. S.D. fought with him and told him numerous times to get off of her. He told her to shut up and be quiet while he pushed and held her arms and head down.

When S.D. tried to get out of the room after he raped her, he pulled her arm back. She sat down on her bed, curled up into the corner of the wall and sent text messages to

10

her sister saying, "Call my name." When her sister did not respond, she sent another text message to her sister, "Please call my name." S.D.'s sister eventually asked, "Why?" S.D. replied saying, "Call my name." Finally, her sister called to her. When S.D. got up, Ndandu said "Shhh. Don't go out there. You're crying." S.D. said, "[My sister is] calling my name." When S.D.'s sister called her name again, S.D. was able to leave the room.

Without speaking to her sister, S.D. fled through a window out of the back of the house and started calling people. She was crying and very upset when she got a ride from a friend and told the friend she was raped. S.D. went to her friend's house. S.D. reported the rape later in the day and went to the hospital where she underwent a sexual assault response team (SART) examination. S.D. identified Ndandu as the person who raped her.

*Ndandu's Defense Testimony*

A

Ndandu, who is originally from Congo, Africa, lived in Michigan in 2009. Ndandu testified he knew S.D.'s sister, through mutual friends. After meeting a group of friends at a bar, S.D.'s sister invited Ndandu and his friend back to her place.

According to Ndandu, S.D.'s sister liked his friend. When Ndandu asked S.D.'s sister, "You ain't got no friend for me?" she asked if he had met her sister. She invited Ndandu and his friend home. When they got to the house, Ndandu introduced himself to S.D. as "Prince." He claimed S.D. asked him what kind of music he liked and they started talking. He testified they had "a relationship" that night.

Ndandu denied raping S.D. He maintained S.D. told him she was 19 years old and wanted to get a job at a strip club. According to Ndandu, S.D. stripped for him, sat on his lap and they had consensual sex. He claimed S.D. came up with the rape story when the mother of his child and her friends became upset because S.D. slept with Ndandu.

B

Ndandu moved to California in 2010 where he met his wife and was married in 2011. They lived in an apartment building in downtown San Diego.

Ndandu testified he went to a bar in the Gaslamp on the night of June 16, 2012, where he met his friend Phelps. Phelps was homeless, but occasionally stayed with Ndandu. After the bar closed, a female friend gave Ndandu a bottle of champagne because she did not want to drive with an open container.

As Ndandu and Phelps were walking back to Ndandu's apartment, they saw B.F. sitting on a corner and asked if she needed help. According to Ndandu, B.F. said her sister and friends left her behind to go home with some men they met in the bar. He testified B.F. told him the men did not want her because she was overweight. Ndandu testified B.F. asked him about his accent and then she stood up, grabbed him by the neck and asked Ndandu and Phelps to take her with them saying "I'm going to [f–k] you tonight because my sister [and friends left] me." Ndandu claimed he said no, but she kissed him. He also said she unzipped his pants and she wanted to put his penis in her mouth. He said he stopped her and asked if she needed to go home. She said she did not have anywhere to go and asked him to take her with him saying she liked him and that

12

she would "kick it" with him. He agreed to take her back to his place and let her sleep in his car. Ndandu asked Phelps to go with them.

After missing one cab, they took a cab to an intersection near Ndandu's home. Ndandu testified B.F. took the bottle of champagne from him and tried to drink it, but did not like it. When she asked him where he was from, he gave her his identification card to show her his African name.[4]

When they got to Ndandu's building, he took Phelps and B.F. to the parking garage and then went upstairs to get car keys. However, his wife would not give him the car keys. Ndandu testified when he returned to the parking garage he saw B.F. moving her hips toward Phelps.

Ndandu testified he took B.F. to the trash room to sleep until morning, but she asked him to stay with her and began kissing him and telling him, "I want to [f–k]." Although he claimed he objected, he laid on top of her. He said she took her clothes off, grabbed his penis and tried to put it inside her vagina, but there was no penetration. Just then, he stated glass fell through the trash chute over them.

Ndandu denied raping B.F. and claimed she raped him. He also said she was such a "big [woman] I can't see her private at all." He stated she pulled his penis out and tried to put it in her vagina, but "[s]he was so big, you can't find it." He also claimed there was a tampon in her vagina and she began bleeding after she removed it.

---

4  Ndandu initially told police detectives he had sex with B.F. in a bar where they were dancing. He did not say B.F. came on to him on the sidewalk in the Gaslamp or in the dumpster area. Nor did he say he gave her his identification card in the cab.

Ndandu claimed B.F. started crying because he told B.F. his wife was home and he needed to leave. As she was crying, the door opened and a woman came in with a pizza box. When the woman asked B.F. if she was all right, Ndandu testified B.F. said, "I'm fine. Leave me alone. Go away. I don't want to talk to you." So the woman left.[5]

*Verdicts and Sentencing*

The jury found Ndandu guilty of forcible rape (§ 261, subd. (a)(2); count 1), rape by a foreign object with the use of force (§ 289, subd. (a); count 2), and forcible oral copulation (§ 288a, subd. (c)(2)(A); count 3). The court sentenced Ndandu to an aggregate term of 10 years in state prison as follows: six years for count 1, and two years each for counts 2 and 3.

The jury found Phelps guilty of forcible rape (§ 261, subd. (a)(2); count 1), rape by a foreign object with the use of force (§ 289, subd. (a); count 2), forcible oral copulation (§ 288a, subd. (c)(2)(A); count 3) based on an aiding and abetting theory. The jury also found Phelps guilty of sexual battery (§ 243, subd. (e)(1); count 4), a lesser included offense of sexual battery by restraint. Finding Phelps was less culpable than Ndandu, the trial court sentenced Phelps to a total term of three years in state prison for each of counts 1, 2, and 3, to be served concurrently, and 365 days in the county jail for count 4, to be served concurrently with his other sentences with credit for time served.

---

5    In his initial interview with detectives, Ndandu said when the lady came in with the pizza box, B.F. said, "No, no, no . . . I want to go. Call the police." Ndandu reported he told the lady they were at a party and were drinking and nothing was going on.

14

DISCUSSION

I

Ndandu and Phelps contend the court failed to instruct the jury sua sponte on attempted forcible rape as a lesser included offense to forcible rape. Ndandu and Phelps contend an instruction for attempted rape was necessary because there was evidence Ndandu did not sufficiently penetrate B.F. with his penis. The People argue there was no substantial evidence Ndandu could be guilty of attempted rape rather than the completed rape. We agree with the People.

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense. [Citation.] 'The rule's purpose is . . . to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence.' [Citation.] In light of this purpose, the court need instruct the jury on a lesser included offense only '[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of' the lesser offense.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 403-404.)

Section 261, subdivision (a)(2), provides in pertinent part "rape is an act of sexual intercourse accomplished with a person . . . against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." "The essential guilt of rape consists in the outrage to the person and feelings

15

of the victim of the rape.  Any sexual penetration, however slight, is sufficient to complete the crime."  (§ 263.)

In this case, there was evidence of injuries to B.F.'s external genitalia, including swelling of her urethra and periurethral area, laceration of the hymen, and abrasion and shearing of the fossa navicularis, which is the depressed area between posterior margin of the vaginal opening and the forchette.  (Merriam-Webster Online Dict. (2014) < http://www.merriam-webster.com/medical/fossa%20navicularis> [as of Oct. 6, 2014].).

Ndandu argues these injuries could have been the result of admitted digital penetration, but do not necessarily rule out an attempted, but incomplete rape.  Ndandu suggests B.F.'s lack of sexual experience caused her to believe penetration occurred but was "merely appellant's erect penis between her legs pushing at the entrance of her vagina that had already been injured when appellant jabbed his fingers into her vagina."  In other words, he argues he did not manage to penetrate B.F. far enough with his penis to complete the rape.  He further argues this "scenario is supported by a strong DNA profile for appellant found on B.F.'s external genitalia."  In Ndandu's reply brief he summarizes his argument on this issue stating, "forcible digital penetration, external injuries, strong DNA from appellant on the external genital swab and B.F.'s extreme intoxication, memory lapses and sexual inexperience all was evidence from which a jury could reasonably conclude that appellant attempted to rape B.F. but was unable to effect penetration."

Ndandu's argument ignores authority holding penetration of the external genitalia is sufficient for completed rape.  In *People v. Karsai* (1982) 131 Cal.App.3d 224 (*Karsai*)

16

the court determined "[p]enetration of the external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape even if the rapist does not thereafter succeed in penetrating into the vagina." (*Id*. at p. 232, overruled on other grounds in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.) The court concluded this interpretation is consistent with the "universal rule among those jurisdictions which have considered the question" and "is in accordance with the clear intent of section 263 which states that any penetration however slight is sufficient." (*Karsai*, *supra*, at p. 233.)

The court in *People v. Quintana* (2001) 89 Cal.App.4th 1362 (*Quintana*) followed *Karsai*, *supra*, 131 Cal.App.3d 224 in defining the sexual penetration required under section 289 for object penetration of a minor as including penetration of the external genetalia. (*Quintana*, *supra*, at pp. 1365-1366.) The *Quintana* court rejected an argument sexual penetration under this statute required penetration of the vagina because the statute refers to "genital or anal openings." The court noted, "[t]he vagina is only one part of the female genitalia, which also include inter alia the labia majora, labia minora, and the clitoris. [Citations.] Thus, 'genital' opening does not necessarily mean 'vaginal' opening." (*Id*. at pp. 1366-1367.)

The court further explained any contact within the external genitalia, i.e. within the vulva, is sexual penetration. "The external female genitalia are referred to as the 'vulva' and ' "[include] the labia majora, labia minora, clitoris and vestibule of the vagina." ' [Citation.] The labia majora ' "form the external lateral boundaries of the vulva." ' [Citation.] The hymen is 'located directly at the front of the opening to the vagina' [citation]; the vagina is ' "the passage leading from the external genital orifice to

17

the uterus" ' [citation]. Accordingly, contact with the hymen as well as the clitoris and the other genitalia inside the exterior of the labia majora constitutes 'sexual penetration.' " (*Quintana*, *supra*, 89 Cal.App.4th at p. 1371.)[6]

Similarly in this case, if Ndandu's erect penis pushed at the entrance to B.F.'s vagina, as suggested in the opening brief, that is completed rape. (§ 263; *Karsai*, *supra*, 131 Cal.App.3d at p. 232; *Quintana*, *supra*, 89 Cal.App.4th at p. 1371.) Furthermore, Ndandu offers no explanation for how his semen could be found in both the external genital swab and in the vaginal swab if he merely attempted, but was not able to complete, the rape of B.F. The fact there was less DNA evidence found in the vagina than found in the external genitalia is of no moment. "Ejaculation . . . is not an element of rape; all that is required is 'sexual penetration, however slight.' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1079, quoting § 263.) Similarly, ejaculation within the vagina is not required for rape, only sexual penetration, however slight, of either the external genitalia or the vagina.

Therefore, Ndandu points to no " 'substantial evidence that an element of the charged offense is *missing,* but that the accused is guilty of' the lesser offense" of attempted rape. (*Shockley*, *supra*, 58 Cal.4th at p. 404, italics added.) To the contrary, there was overwhelming evidence of penetration of at least B.F.'s external genitalia.

---

6    This definition is consistent with that in Stedman's Medical Dictionary (28th ed. 2006) at page 2143, column 2, which defines the vulva as "[t]he external genitalia of the female, composed of the mons pubis, the labia majora and minora, the clitoris, the vestibule of the vagina and its glands, and the opening of the urethra and of the vagina."

Even if we were to assume the court erred in failing to instruct regarding attempted rape, a proposition with which we do not agree, reversal is not required because any error was harmless under both the federal and state standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 & *People v. Watson* (1956) 46 Cal.2d 818, 836-837.) The jury in this case was not presented with an all or nothing proposition. (*People v. Breverman* (1998) 19 Cal.4th 142, 202.) In addition to instructing the jury regarding rape, the court instructed the jury on the lesser-included offense of simple battery. If the jury had concluded there was insufficient evidence of a completed rape, it could have found Ndandu and Phelps (as an aider and abettor) guilty of simple battery. It did not. Therefore, we conclude there is no reasonable chance a jury would have returned a more favorable verdict if it were given an attempted rape instruction.

## II

Ndandu next contends the court erred in admitting evidence of the prior uncharged rape in Michigan and violated his right to due process. Phelps argues, if the conviction against Ndandu is reversed based on admission of the Michigan evidence, Phelps' conviction should be reversed as well since he was convicted as an aider and abettor.

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

19

Evidence Code section 1108 is a legislative exception to the general rule prohibiting character evidence in the form of specific acts. (Evid. Code, § 1101; *People v. Callahan* (1999) 74 Cal.App.4th 356, 367.) In enacting Evidence Code section 1108, " 'the Legislature "declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness." ' " (*Callahan*, *supra*, 74 Cal.App.4th at p. 367.) " 'Our elected Legislature has determined that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence. The Legislature has determined the need for this evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.' " (*People v. Falsetta* (1999) 21 Ca1.4th 903, 911 (*Falsetta*).)

The Supreme Court in *Falsetta* rejected a due process challenge to Evidence Code section 1108 concluding the "trial court's discretion to exclude propensity evidence under [Evidence Code] section 352 saves [Evidence Code] section 1108 from defendant's due process challenge." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) This is so even in the case of an uncharged offense. (*People v. Villatoro* (2012) 54 Ca1.4th 1152, 1165-1166.)

The *Falsetta* court explained the Legislature's principle, and practical, justification for adopting Evidence Code section 1108: "By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. [Evidence Code section]

20

1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*Falsetta*, *supra*, 21 Ca1.4th at p. 915.) This bears on the "probability or improbability that the defendant has been falsely or mistakenly accused of such an offense." (*Id.* at p. 912, internal quotations marks omitted.)

"By reason of [Evidence Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under [Evidence Code] section 352." (*Falsetta*, *supra*, 21 Ca1.4th at pp. 916-917.) "Specifically, the court weighs factors such as the 'nature, relevance, and possible remoteness [of the evidence], the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses . . . .' " (*People v. Merriman* (2014) 60 Cal.4th 1, 41.) " 'This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.' " (*Falsetta*, at pp. 917-918.)

In this case, the court engaged in a careful weighing process as required by Evidence Code sections 352 and 1108. The court considered the proximity of the alleged crimes was within approximately three years as opposed to 10 years or more. The nature of the offenses, both involving young women, were similar as opposed to vastly different types of sexual offenses. The court determined the facts of the prior incident were no

21

more inflammatory than the facts in this case. The court also weighed the fact there was neither a conviction nor an acquittal in the Michigan case at the time of trial. The court expressed its view a conviction would be far stronger evidence for the jury to consider how to use the prior act. Instead, the jury in this case could consider the prior incident or not as they see fit. After considering the various factors the court found the prior uncharged Michigan offense was admissible because it was "highly probative" and its probative value outweighed the limited prejudicial impact.

The prosecution's evidence regarding the Michigan case was not unduly time consuming. It consisted of three witnesses: the victim, the victim's friend who picked her up after the incident, and the forensic examiner who obtained the DNA evidence and received the CODIS hit matching Ndandu's DNA in the San Diego case. Examination and cross-examination of these witnesses consumed just over one hour out of a trial consisting of four days of testimony. The jury was aware the Michigan case was still pending.

The court instructed the jury regarding the limited purpose of the Michigan evidence both before the Michigan witnesses testified and during final jury instructions. The court instructed the jury the Michigan incident was "not charged in this case" and was "not sufficient by itself to prove that the defendant [was] guilty of any of the charged offenses in this case." It also instructed the jury the uncharged crime evidence was only one factor to consider and was "not sufficient by itself to prove that the defendant [was] guilty of any of the charged offenses in this case. The People must still prove each charge beyond a reasonable doubt." "These instructions, combined with the fact that the

22

impact of the prior offense[] was no more egregious than the charged offense . . . foreclosed the risk the jury would consider the evidence for a prohibited purpose."  (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 969.)

Ndandu has not presented evidence he was unduly burdened in providing a defense.  He testified in his own defense regarding the Michigan incident and the San Diego incident.  We find no abuse of discretion and "conclude that defendant has failed to carry his burden of rebutting the strong presumption of admissibility of the sexual assault crimes evidence under Evidence Code section 1108."  (*People v. Merriman*, *supra*, 60 Cal.4th at p. 42.)

## DISPOSITION

The judgments are affirmed.

McCONNELL, P. J.

WE CONCUR:

HALLER, J.

O'ROURKE, J.

23